

# In the Missouri Court of Appeals
## Eastern District

### DIVISION THREE

| | | |
|---|---|---|
| CHARLES MEMS and ELAINE MEMS, | ) | No. ED106319 |
| | ) | |
| Appellants, | ) | Appeal from the Circuit Court of |
| | ) | the City of St. Louis |
| vs. | ) | 1622-CC00206 |
| | ) | |
| DWAYNE A. LABRUYERE, | ) | Honorable Robert H. Dierker, Jr. |
| | ) | |
| Respondent. | ) | Filed: May 21, 2019 |

### OPINION

#### Introduction

A jobsite incident that caused Charles Mems serious personal injuries gave rise to this case and its resolution centers on the complicated and long-running effort by Missouri's legislative and judicial branches to define the right of one employee to sue another for tortious conduct occurring on the job.

Dwayne LaBruyere and Charles Mems were employed by C. Rallo (Employer), a contractor hired to carry out certain renovations at the St. Louis Convention Center. LaBruyere and Mems were tasked with removing a heavy overhead roller door from a mechanical assembly above a concession stand window. During this process, LaBruyere caused the roller door to suddenly detach and fall onto Mems, striking his chest and neck, knocking him to the floor, and impaling his leg with a hook that was attached to the door. Mems pursued a workers'

compensation claim against Employer. Then, together with his wife, Elaine Mems, he filed the civil lawsuit before us against his co-employee LaBruyere for negligence and loss of consortium.

The suit alleged that LaBruyere negligently caused the roller door to fall onto Mems while he was standing below it, causing Mems serious injuries. LaBruyere moved for summary judgment contending that under the 2012 amendment to § 287.120.1[1]—which is applicable to this case since Mems's injuries occurred on June 27, 2013—he is immune from liability because the amendment provides that an employee "shall not be liable for any injury or death for which [worker's] compensation is recoverable" and "shall be released from all other liability whatsoever" except where the employee has "engaged in an affirmative negligent act that purposefully and dangerously caused or increased the risk of injury." LaBruyere argued that it was undisputed that LaBruyere's actions failed to satisfy this statutory language.

The motion court found that there was evidence in the record from which a jury could conclude (1) that LaBruyere instructed Charles Mems to stand beneath the roller-door assembly while LaBruyere removed the bolts connecting the door to the wall and pried the door away from the wall causing the door to fall; (2) that LaBruyere did so knowing Mems was standing underneath and knowing that his actions would start the process of the door falling; and (3) that LaBruyere's actions in fact caused the door to detach from the wall and fall onto Mems injuring him.

Nevertheless, the court entered summary judgment in favor of LaBruyere, finding specifically that Appellants failed to establish as a genuinely disputed fact that LaBruyere had engaged in "purposeful, inherently dangerous conduct." The Memses now appeal asserting that they established as genuinely disputed factual matters that LaBruyere engaged in an affirmative

---

[1] All statutory references are to RSMo 2012 unless otherwise indicated.

2

negligent act that purposefully and dangerously caused or increased the risk of injury to Charles Mems. The Memses also contend that the court misapplied § 287.120.1 by requiring them to prove that LaBruyere committed *inherently* dangerous conduct, since the statute has no such requirement. Because we find that the motion court misapplied the law in this regard and because we further find to be matters of disputed fact whether LaBruyere's actions satisfied the language of § 287.120.1—"affirmative negligent act that purposefully and dangerously caused or increased the risk of injury" to Charles Mems—we reverse and remand for a trial on the merits.

## Standard of Review

Summary judgment is proper *only* when the parties are not genuinely disputing material factual issues and when the moving party is entitled to judgment *as a matter of law. ITT Commercial Fin. Corp. v. Mid-Am. Marine Supply Corp.*, 854 S.W.2d 371, 380 (Mo.banc 1993). Therefore, we review *de novo* whether the motion court properly granted summary judgment. *Higgenbotham v. Pit Stop Bar & Grill, LLC*, 548 S.W.3d 323, 328 (Mo.App.E.D. 2018) (citing *Rice v. Hodapp*, 919 S.W.2d 240, 243 (Mo.banc 1996)).

Summary judgment is an extreme and drastic remedy and great care should be exercised in utilizing it. *ITT Commercial*, 854 S.W.2d at 377 (citing *Cooper v. Finke*, 376 S.W.2d 225, 229 (Mo.banc 1964)). Summary judgment borders on the denial of due process in that it denies the opposing party their day in court. *Id.* (citing *Olson v. Auto Owners Ins. Co.*, 700 S.W.2d 882, 884 (Mo.App.E.D. 1985). Although it is useful and beneficial in many situations, it cannot replace a conventional trial of factual issues unless the prevailing party is shown to be entitled thereto, as a matter of law, by proof flowing from facts about which there is no genuine dispute. *Id.* at 377-78.

In light of these principles, we view the record in the light most favorable to the party against whom judgment was entered, according that party all reasonable inferences drawn from

3

the record. *ITT Commercial*, 854 S.W.2d at 376. A defendant is entitled to summary judgment only if the defendant has shown at least one of the following: (1) facts negating any one of the plaintiff's elements necessary for judgment; (2) that the plaintiff, after an adequate period of discovery, has not been able to produce evidence sufficient to allow the trier of fact to find the existence of all of the plaintiff's elements; or (3) facts necessary to support the defendant's properly-pleaded affirmative defense. *Roberts v. BJC Health Sys.*, 391 S.W.3d 433, 437 (Mo.banc 2013) (citing *ITT Commercial*, 854 S.W.2d at 381).

Finally, we review all questions of law *de novo*. *Pierce v. BSC, Inc.*, 207 S.W.3d 619, 621 (Mo.banc 2006). Statutory interpretation is a question of law reviewed *de novo*. *Nelson v. Crane*, 187 S.W.3d 868, 869 (Mo.banc 2006). So is the application of the statute, at least on review of a grant of summary judgment. *Hudson v. O'Brien*, 449 S.W.3d 87, 91 (Mo.App.W.D. 2014). Moreover, in the context of a claim of co-employee negligence, the determination whether the co-employee had a duty to the plaintiff is a question of law, as is the inextricably-linked question of the scope of the employer's duty. *McComb v. Norfus*, 541 S.W.3d 550, 554-55 (Mo.banc 2018); *see also Peters v. Wady Indus., Inc.*, 489 S.W.3d 784, 793-95 (Mo.banc 2016) (holding that the question whether a duty existed between the plaintiff and the defendant is purely a question of law, and that it is also a legal question whether a co-employee owes no duty because he was merely carrying out a non-delegable duty of his employer).

## Discussion

The viability of the Memses' civil claim for damages against LaBruyere stands or falls based on whether the Memses brought forth sufficient evidence to the summary judgment record below that would allow a jury to find that LaBruyere is not immune from liability because he "engaged in an *affirmative negligent act* that *purposefully* and *dangerously* caused or increased the

4

risk of injury" to Charles Mems. Thus, resolution of this appeal centers almost exclusively on the meaning the legislature intended for the five operative words italicized above. And since those words have lurked in one form or another during the over century-long jurisprudential and legislative struggle to resolve the co-employee liability question, we begin our analysis by examining the historical struggle to resolve this question which will assist our understanding of the legislature's intent with respect to the foregoing provision.[2]

I.      *Civil liability among co-employees in Missouri arising from workplace injuries.*

      A.      From misfeasance to the breach of an independent duty.

Prior to the enactment in 1926 of Missouri's workers' compensation law (the "Act"), one employee could be held civilly liable for personal injury to another employee, though only for *misfeasance*, where the employee negligently *performed*—not merely *failed* to perform—a task assigned by his employer. *State ex rel. Badami v. Gaertner*, 630 S.W.2d 175, 177 (Mo.App.E.D. 1982) (en banc) (citing *Jewell v. Kansas City Bolt & Nut Co.*, 132 S.W. 703, 711 (Mo.banc 1910); *McGinnis v. Chicago, R.I. & P. Ry. Co.*, 98 S.W. 590, 592 (Mo.banc 1906)).

Then the 1926 Act granted *employers* immunity from civil liability for employees' on-the-job personal injuries since compensation from employers was made available under the Act.[3] *Id.*

---

[2] When the legislature enacts a statute referring to terms which have had other legislative or judicial meanings attached to them, the legislature is presumed to have acted with knowledge of these meanings. *See Citizens Electric Corp. v. Director of Revenue*, 766 S.W.2d 450, 452 (Mo.banc 1989).

[3] "It was the purpose of the workmen's compensation law to place the burden of employment accidents upon the employer and ultimately upon the consuming public generally. To accomplish this purpose, the employee was entitled to recover for such accidents without the necessity of establishing negligence and was freed from defenses such as fellow servant, contributory negligence and assumption of risk. The employer on the other hand received immunity from general tort liability and damages and received an established basis for determining the extent of its monetary liability." *Badami*, 630 S.W.2d at 180.

at 178-79. But employees could still be civilly liable to each other for misfeasance based on common-law principles. *Id.* Then in *Sylcox v. Nat'l Lead Co.*, 38 S.W.2d 497 (Mo.App. 1931), this Court found that since an employee who caused injury to a co-employee had no immunity under the Act, he was treated no differently than the common law treated a third person who caused injury to the co-employee, reasoning that "at common law one servant is liable to another for his own misfeasance, and there is nothing in the Act which destroys such liability, or in any way disturbs the common law relationship existing between co-employees." *Badami*, 630 S.W.2d at 178 (quoting *Sylcox*, 38 S.W.2d at 502) (internal quotation marks omitted). Thus, it became accepted that an employee, as a "third person" within the meaning of the Act, could be sued by an injured co-worker for his negligence. *See also Lamar v. Ford Motor Co.*, 409 S.W.2d 100 (Mo.banc 1966); *Schumacher v. Leslie*, 232 S.W.2d 913 (Mo.banc 1950); *Gardner v. Stout*, 119 S.W.2d 790 (Mo.banc 1938).

Five years later, our Supreme Court decided *Lambert v. Jones*, 98 S.W.2d 752 (Mo.banc 1936). There, a woman was injured when she fell down a stairway due to a loose step. *Id.* at 753. Lambert's claim against Jones, as the corporate building owner's president and agent, set the stage for the Court's pronouncements which are relevant to the case at bar. *Id.*

The Court first looked at the misfeasance/nonfeasance dichotomy and Jones's specific argument that he could not be liable to Lambert for nonfeasance (the failure to inspect and repair

---

Despite this new bargain, however, we note that employers and employees were still permitted, until the repeal in 1978 of a particular provision of the Workers' Compensation Act, to opt out of the workers' compensation statutory scheme. *Peters*, 489 S.W.3d at 791. When the employer opted in but the employee opted out, the employer could in actions by injured employees use certain defenses, including drawing upon the erstwhile doctrine that employers were not liable for injuries to employees that were caused by the negligent acts of a "fellow servant" unless those acts constituted misfeasance. *Id.*

the step) because Lambert was a third person with whom Jones had no privity and to whom he owed no duty because his only duty was to his principal, the building owner. *Id.* at 757-758. The Court found the misfeasance/nonfeasance dichotomy to be "a fictitious distinction, which can only result in confusion." *Id.* at 757. To address this confusion, the Court clarified the test used to determine when an employee may be liable to *third persons*, stating:

> [A] servant or agent is liable for acts or omissions causing injury to third persons whenever, under the circumstances, he owes a duty of care in regard to such matters to such third persons. In short, he would be liable whenever he is guilty of such negligence as would create a liability to another person if no relation of master and servant or principal and agent existed between him and someone else.

*Id.* at 759. "In other words, the liability of the servant or agent . . . results from the breach of a duty owed to the third party under the law, which makes him liable without regard to whether he is the servant or agent of another." *Ryan v. Standard Oil Co. of Ind.*, 144 S.W.2d 170, 173 (Mo.App. 1940). Thus, in *Lambert*, the Missouri Supreme Court shifted the focus from whether the employee had engaged in misfeasance or nonfeasance to whether the employee had breached the duty of care he owed to the third person.

These concepts were further clarified by the Court in *Marshall v. Kansas City*, 296 S.W.2d 1, 3 (Mo.banc 1956). There, two sewer department co-workers—Parker and Marshall—were tasked with cutting a hole in pavement using a jackhammer that was powered by an air compressor located in a work truck and connected to the jackhammer by a compressor hose. *Id.* at 2. While Marshall was carrying the jackhammer, Parker began pulling and shaking the compressor hose to straighten it and get the kinks out of it but the hose caught Marshall's feet causing him to fall and be injured. *Id.*

The Court found that while the City owed its employees the "non-delegable duty to furnish safe tools and appliances and a reasonably safe place to work," there was no evidence that the hose

7

was defective or that the place of work was not reasonably safe. *Id.* at 3. Rather, "Marshall's injury came about by reason of Parker's negligent use of the hose ... not because it was defective," and the workplace was not unsafe but became so "due to the method or manner in which the work was being done." *Id.* The Court concluded that "Marshall's injuries resulted from the negligent act of his fellow employee and not by reason of the breach of any non-delegable duty owed by the city." *Id.*

While a number of cases in this area have aged poorly, the soundness of the principles laid down in *Marshall* was recently reaffirmed by the Supreme Court in *Conner v. Ogletree*, 542 S.W.3d 315, 324 (Mo.banc 2018), and though co-employee liability is now partially codified in § 287.120.1, *Marshall* still substantially illuminates co-employee liability issues, particularly with regard to whether a co-employee's conduct breached an independent duty to a fellow employee, or merely one of the employer's non-delegable duties.

From *Marshall*, we draw several conclusions: (1) the employer's duties to provide a safe workplace and to provide safe work tools or instrumentalities are not all-encompassing—not every unsafe condition at a jobsite results exclusively from the breach of one of those duties; (2) an employee may be liable based on the breach of his own duty of care owed to a co-worker when, through the negligent method or manner of carrying out the job or through the negligent use of a non-defective tool or instrumentality, he creates a danger or hazard which results in injury to his co-worker; and (3) foreseeability *to the employer* is critical—consistent with our long-established understanding of the question of duty[4]—to whether a risk is one falling within the employer's non-

---

[4] *See also Lopez v. Three Rivers Elec. Co-op., Inc.*, 26 S.W.3d 151, 156 (Mo.banc 2000) (emphasis added) ("[T]he concept of foreseeability is paramount in determining whether a duty exists. . . . Foreseeability for purposes of establishing whether a defendant's conduct created a duty to a plaintiff depends on whether *the defendant* should have foreseen a risk in a given set of

8

delegable duties to provide safe work instruments or a safe workplace or whether it is an unforeseeable, transitory risk created by the negligence of a co-employee.

With regard to this latter issue, the Supreme Court in its 2018 *Conner* decision described such "transitory risks" as follows:

> [T]his term has a settled meaning in this Court's jurisprudence and refers to a co-employee's negligence that decreases workplace safety in a way that was not reasonably foreseeable to the employer and, therefore, not within the employer's non-delegable duty to provide a reasonably safe workplace. In *Redmond v. Quincy, O. & K.C.R. Co.*, 126 S.W. 159 (Mo. 1909), for example, this Court explained that a "master [who] furnishes a reasonably safe place for the servant to work in ... is not liable for a *transitory danger* arising out of a single occurrence in which [the master] is not at fault, and *of which [the master] has no notice or opportunity to correct."* *Id.* at 165. In modern parlance, there was no breach of the employer's non-delegable duty to provide a reasonably safe workplace because this risk was not reasonably foreseeable to the employer. (Emphasis in original; footnote omitted).

542 S.W.3d at 325-26.

## B. The *Badami* Detour: Statutory Immunity and the "Something More" Test

In 1982, this Court in *State ex rel. Badami v. Gaertner*, 630 S.W.2d 175, 178, 180-81 (Mo.App.E.D. 1982) (en banc) engineered a major detour. In a narrow decision (just seven of the Court's 13 judges concurred in the majority opinion), this Court resolved to "*fix our compensation legislation* with [the] independently developed conceptual change" from *Lambert*: the elimination of the misfeasance/nonfeasance dichotomy and the shift in focus to whether a co-employee breached an independent duty. *Id.* at 757 (emphasis added). Whether a "fix" was needed is debatable since the change *Lambert* wrought to the common law had already been smoothly

circumstances."); *Hoover's Dairy, Inc. v. Mid-Am. Dairymen, Inc./Special Prod., Inc.*, 700 S.W.2d 426, 431 (Mo.banc 1985) (emphasis added) ("When deciding if some injury was reasonably foreseeable, whether expressly or implicitly, courts examine what *the actor knew or should have known."*).

implemented by the Missouri Supreme Court in such co-employee liability cases as *Marshall*—the misfeasance/nonfeasance dichotomy had been roundly panned and the focus had become whether the co-employee had generated an unforeseeable transient risk through negligent conduct that made unsafe an otherwise reasonably safe workplace or non-defective work instrumentality. 296 S.W.2d at 3.

Nevertheless, the *Badami* court departed from the then-prevailing view in Missouri of co-employee liability. Looking to the Act and to similar workers' compensation laws from other states such as Wisconsin, the *Badami* court found that the language and policy of Missouri's workers' compensation law dictated a conclusion that no court in our state had ever before reached: that the Act granted to the co-employee *immunity* from tort claims brought by a fellow employee for a personal injury sustained at work, *except* where the defendant co-employee committed an "*affirmative act* causing or increasing the risk of injury" to the plaintiff. 630 S.W.2d at 180 (emphasis added). The *Badami* court reasoned that the Missouri Legislature intended the Act to limit co-employee liability to cases where the co-employee did "something more" than breach a general, non-delegable duty of the employer:

> In view of the law of this state as to employees which existed at the time our compensation act was passed and in view of the previously discussed policy considerations, we find the approach developed by the Wisconsin Courts comes closest to defining the intent of our legislature. Charging the employee chosen to implement the employer's duty to provide a reasonably safe place to work merely with the general failure to fulfill that duty charges no actionable negligence. Something more must be charged.

*Id.*

So, while *Badami* brought the co-employee liability analysis into the contours of the Act, the immunity for employees that it created was effectively identical to the common law principle that an employee could not be held liable for simply carrying out one of the employer's non-

10

delegable duties (e.g., provide safe workplace, safe work instrumentalities or tools, and safe work method)—a common law principle dating back in Missouri to at least 1909, *see Redmond, supra,* and surviving unmolested the 1926 passage of the Act as illustrated in such decisions as *Lambert* and *Marshall, supra.*

Though the immunity *Badami* granted to employees was effectively identical to the common law's protection, the second part of the co-employee liability analysis—whether the employee breached his own duty of care to his co-employee—differed substantially. Under the common law, an employee, through misfeasance or nonfeasance, could be held liable for creating a transitory risk through the negligent method or manner of doing the job. But *Badami* and its progeny represented a clear departure from the common law approach by coming down firmly on the misfeasance side of that dichotomous debate to require the showing of an *"affirmative* act causing or increasing the risk of injury." *Id.* at 180 (emphasis added).

Then, a little more than a decade later, the Court in *Kelley v. DeKalb Energy Co.,* 865 S.W.2d 670, 672 (Mo.banc 1993), affirmed for the first time *Badami's* holding that employees enjoyed immunity under the Act demonstrating that our Supreme Court was no longer satisfied to analyze questions of co-employee liability exclusively under the common law as it had in *Marshall.* The *Kelley* Court declared that suits for breach of the employer's non-delegable duty are *"excluded* by the workers' compensation law" though "an employee may sue a fellow employee for *affirmative negligent acts* outside the scope of an employer's responsibility to provide a safe workplace." *Kelley,* 865 at 672 (emphasis added).

While *Kelley* appears to have refined *Badami's* "something more" test by adding the word *negligent,* we believe the change was minimal because an "affirmative act causing or increasing the risk of injury" appears to be all but identical to an "affirmative negligent act" since the essence

11

of negligence is the duty to avoid causing foreseeable risks of injury to another. *Hoover's Dairy, Inc. v. Mid-Am. Dairymen, Inc./Special Prod., Inc.*, 700 S.W.2d 426, 431 (Mo.banc 1985).

When it next addressed co-employee immunity, in 2002, see *State ex rel. Taylor v. Wallace*, 73 S.W.3d 620, 622-23 (ordering the dismissal of a co-employee liability claim), the Supreme Court cited several of this Court's decisions that had endeavored to apply *Kelley* and asserted that "[t]he question of what constitute[d] an '*affirmative negligent act*' ha[d] not prove[d] susceptible of reliable definition, and Missouri courts ha[d] essentially applied the rule on a case-by-case basis with close reference to the facts in each individual case." *Id.* at 622, 622 n.7 (emphasis added). In connection with this observation, the Court stated for the first time that it was looking for "purposeful, affirmatively dangerous conduct," though the Court did not explain what meaning it placed on the word "purposeful"—which it had just added to the *Badami* test—other than to cite to several post-*Badami* appellate decisions rendered during the time the Court had declared that what constituted an "'affirmative negligent act' ha[d] not prove[d] susceptible of reliable definition." *Id.*

Thus, in about 20 years, *Badami* took this jurisprudence from the firmly-grounded common law approach to a hybrid approach—statutory and common law—whereby the extension of the Act's immunity to co-employees could only be overcome by proving the defendant co-employee's conduct was *affirmative, negligent, purposeful,* and *dangerous.* And although those terms and concepts were certainly rooted in the common law solution to this problem, their meanings had become blurred in the post-*Badami* context. *See, Peters,* 489 S.W.3d at 797-800.

C. The 2005 Amendment: Reading Co-Employee Immunity Out of Existence

In 2005, the Missouri Legislature amended § 287.800 of the Act to require strict, as opposed to liberal, construction of its terms. As a result of this change, the Western District in

12

*Robinson v. Hooker*, 323 S.W.3d 418, 425 (Mo.App.W.D. 2010) found that because § 287.120.1

did not mention employee liability or immunity, that section could no longer properly be construed

as it had been in *Badami*, *Kelley*, and *Taylor* to provide immunity to co-employees. Rather, the

*Robinson* court concluded, reading the statute strictly, that there was nothing in it to preclude an

employee who sustained a work-related injury from bringing a common law action against a

negligent co-employee. *Id.* at 425. Thereafter, the Western District began analyzing co-employee

negligence claims under the common law for injuries occurring after the 2005 amendment. *See,*

*e.g., Hansen v. Ritter*, 375 S.W.3d 201, 206-19 (Mo.App.W.D. 2012).[5]

D.     The 2012 Amendment: Co-Employee Statutory Immunity Returns

However, in 2012, the Missouri Legislature amended *§ 287.120.1 itself* to reestablish co-

employee statutory immunity with one exception. The amendment, which governs our analysis in

this case, provides in pertinent part:

> Every employer subject to the provisions of this chapter shall be liable, irrespective of negligence, to furnish compensation under the provisions of this chapter for personal injury or death of the employee by accident or occupational disease arising out of and in the course of the employee's employment. *Any employee of such employer shall not be liable for any injury or death for which compensation is recoverable under this chapter and every employer and employees of such employer shall be released from all other liability whatsoever*, whether to the employee or any other person, *except that an employee shall not be released from liability for injury or death if the employee engaged in an affirmative negligent act that purposefully and dangerously caused or increased the risk of injury.*

(emphasis added).

_____

[5] Nevertheless, our Court continued to apply *Badami*, *see, e.g., Amesquita v. Gilster-Mary Lee Corp.*, 408 S.W.3d 293, 303-05 (Mo.App.E.D. 2013), and the Supreme Court did not mandate which was the correct approach until 2016 in *Peters v. Wady Indus., Inc.*, 489 S.W.3d 784, 792 n.6, although, as explained below, the correct approach was not dependent on the 2005 amendment's change from liberal to strict construction of the Act.

The legislature did not define the phrase "affirmative negligent act" or the terms "purposefully" or "dangerously."

E.    *Peters*: Assessing the Continued Viability of the *Badami* Detour

In 2016, in *Peters v. Wady Indus., Inc.*, 489 S.W.3d at 787, 789-800, the Supreme Court considered co-employee liability claims for injuries that occurred between the 2005 and the 2012 amendments to the Act. While *Peters* was not addressing the 2012 amendment to § 287.120.1 itself, the Court's pronouncements with respect to (1) co-employee immunity, (2) *Badami,* and (3) the relevant common law, make *Peters* pertinent to our discussion.

The Court first addressed the continued viability of *Badami's* holding that co-employees enjoyed immunity under the Act in light of the Western District's holding in *Robinson, supra,* that under the 2005 amendment's mandate to strictly construe the Act, co-employees no longer had immunity. 489 S.W.3d at 789-93. The Court disavowed *Badami,* declaring that prior to the 2012 amendment that granted employees general immunity from workplace injury suits, co-employees *never* had immunity under the Act. *Id.* at 792 n.6. The *Peters* Court determined that "[t]he holding [in such cases as *Badami, Kelley,* and *Taylor*] that [the Act's] immunity extended to co-employees was inconsistent with established workers' compensation precedent and resulted in the adoption of a standard not supported under any construction of the workers' compensation law's exclusivity provisions." *Peters,* 489 S.W.3d at 791. Accordingly, the Court found that *Robinson* was *correct in its holding* that co-employees were not entitled to immunity under § 287.120.1, RSMo Supp. 2005, but *Robinson* was *incorrect in its reasoning*—co-employee immunity was not *eliminated* as a result of the change from liberal to strict construction of the workers' compensation law, because it *never existed* prior to the 2012 amendment. *Peters,* 489 S.W.3d at 792 n.6. Thus, *Peters* signaled

14

the return to prominence of the common law decisions such as *Lambert* and *Marshall* in determining co-employee civil liability.

The *Peters* Court then pondered the viability of the post-*Badami* caselaw with its shifting standards for what constituted *something more* than the breach of one of the employer's non-delegable duties. *Id.* at 796-8. The Court compared the *Badami* test to the common law and observed that *Badami*'s "something more" was not entirely misguided because it was "generally consistent with the common law principle that an employee cannot be held liable for breach of the employer's non-delegable duty to provide a safe workplace." *Id.* at 800. But the Court also opined that to the extent the "something more" test required *affirmative* conduct for the co-employee to be liable, and to the extent that subsequent applications of the "something more" test in *Taylor* and elsewhere required *purposeful* and *dangerous* conduct, those tests conflicted with the common law. *Id.*

Indeed, the *Peters* Court recognized that the requirement of an "affirmative" act marked a rebirth of the discarded distinction between misfeasance and nonfeasance. *Id.* at 797. Importantly for our case, the Court made this observation fully aware that the 2012 amendment had added the requirement of an "*affirmative* negligent act" to prove co-employee liability. And with regard to the post-*Badami* cases such as *Taylor* that appeared to take the "something more" test even further away from its common law origins, the *Peters* Court stated that "common law does not limit a co-employee's liability to conduct that is purposeful, inherently dangerous, or directed to the injured employee." *Id.* at 798.

II.  *Here, the grant of summary judgment was in error because the motion court misconstrued and misapplied § 287.120.1 in that (1) the record before us establishes as matters of genuinely disputed fact that LaBruyere's conduct satisfied § 287.120.1's exception to co-employee immunity and (2) the motion court insertion of the requirement that the Memses*

15

*prove _inherently_ dangerous conduct is erroneous because the word inherently is not found in § 287.120.1.*

We now turn to the merits of this appeal noting first that since the motion court's summary judgment was based on its interpretation, construction, and application of a statute, § 287.120.1, our review is *de novo. See Hudson v. O'Brien*, 449 S.W.3d 87, 91 (Mo.App.W.D. 2014) (holding that on review of summary judgment, interpretation and application of statute are subject to *de novo* review).

Our review takes the following course: (1) Construe the meaning of the language of § 287.120.1's exception to co-employee immunity; (2) Determine whether on this summary judgment record the Memses established as matters of genuinely disputed fact that LaBruyere's actions satisfied this exception;[6] and (3) If LaBruyere is not immune, determine whether his conduct constituted a breach of his own common law duty of care to Mems *or* whether he was merely carrying out one of the employer's non-delegable duties such as to provide a reasonably safe workplace, in which case LaBruyere cannot be personally liable to the Memses.

Our review addresses a relatively short statutory query: *Whether LaBruyere engaged in an affirmative negligent act that purposefully and dangerously caused or increased the risk of injury to Mems.* But while it may appear short and straightforward, as the lengthy first portion of this opinion demonstrates, the meaning and application of the words and concepts packed into that

---

[6] The Memses argue other grounds for reversal. They assert that summary judgment was erroneous because the court relied on certain of LaBruyere's statements of uncontroverted fact that violated Rule 74.04(c) (1) and should have been disregarded. They also assert that the court erroneously relied on a self-serving affidavit filed by LaBruyere and that the court inappropriately addressed the legal issue whether LaBruyere owed Mems a common law duty even though LaBruyere expressly limited the basis for his motion to the application of § 287.120.1 to this case and did not address that question in his motion. Given our disposition of this appeal, these points are moot and we need not address them.

short phrase have for many decades perplexed and beleaguered lawyers, judges, and legislators. Therefore, our analysis will move deliberately to parse the operative language as we seek to comprehend and apply the meaning ascribed by the legislature to those terms.

Of course, we are guided by the following well-worn rules of statutory construction: We are to give words their plain and ordinary meaning whenever possible, and our goal is to give effect to the intent of the legislature. *St. Louis Police Officers' Ass'n v. Board of Police Comm'rs of City of St. Louis*, 259 S.W.3d 526, 528 (Mo.banc 2008). Statutes are to be interpreted to avoid unreasonable or absurd results, including those that might defeat the purpose of the legislature. *Id.*; *Leiser v. City of Wildwood*, 59 S.W.3d 597, 603 (Mo.App.E.D. 2001). We must presume that the legislature included every word of a statute for a purpose, and that every word has meaning. *Hewitt v. St. Louis Rams P'ship*, 409 S.W.3d 572, 574 (Mo.App.E.D. 2013).

Additionally, we are permitted—and daresay, in the context of this jurisprudence, *required*—by the following principles to look to the judicial meaning that has been given over the past century or more to the critical words and phrases of § 287.120.1: When the legislature enacts a statute referring, in particular, to terms that have had other judicial or legislative meaning attached to them, the legislature is presumed to have acted with knowledge of that judicial or legislative action. *Citizens Electric Corp. v. Dir. of Dept. of Revenue*, 766 S.W.2d 450, 452 (Mo.banc 1989). And where a statute does not clearly abrogate the common law either expressly or by necessary implication, the common law rule remains valid. *State ex rel. KCP & L Greater Mo. Operations Co. v. Cook*, 353 S.W.3d 14, 20 (Mo.App.W.D. 2011).

A.   "An affirmative negligent act that purposefully and dangerously caused or increased the risk of injury." § 287.120.1.

17

With the phrase "affirmative negligent act," the legislature chose to modify the noun *act* with the two adjectives *affirmative* and *negligent* such that the act or conduct in question must be both *affirmative* and *negligent*. Thus, we will parse that phrase into two.

1. An *affirmative* act.

It is unmistakable in our judgment that by using the word *affirmative,* the legislature came down squarely on the misfeasance side of the century-long misfeasance/nonfeasance debate. In that way, the misfeasance requirement has come full circle. Proving misfeasance in order to recover from a tortfeasor co-worker was the rule dating back to at least 1874, see *Harriman v. Stowe,* 57 Mo. 93, 99 (1874), until it was buried in 1936 by the Supreme Court in *Lambert,* 98 S.W.2d at 759. Then *Badami* resurrected it in 1982 until it was again suppressed by *Peters* in 2016. 489 S.W.3d at 797. And now it has been statutorily re-established by § 287.120.1's inclusion of the word "affirmative."

The parameters of what constitutes misfeasance as opposed to nonfeasance or omission in the co-employee liability context has received hearty attention over the years. Generally speaking, misfeasance requires an affirmative act as opposed to the failure to act. *See, e.g., Harriman,* 57 Mo. at 99. But even an omission could involve something other than nonfeasance if an employee "undertakes the performance of a positive act and wrongfully omits an act essential to the proper performance of the positive act [in which case] such omission is regarded as misfeasance." *Ryan v. Standard Oil Co. of Ind.,* 144 S.W.2d 170, 172 (Mo.App. 1940).

And the relevant dictionary definitions are in accord that action is required as opposed to the failure to act. "Affirmative" is defined as "assertive, positive" by WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 36 (2002); and as "involving or requiring effort" in BLACK'S LAW DICTIONARY 68 (9th ed. 2009). These conceptions of "affirmative" conduct are reinforced by the

18

apposite definitions of the word "act" in the same two dictionaries: "a thing done or being done: deed, performance," WEBSTER'S 20, "Something done or performed, esp. voluntarily; a deed." BLACK'S 68.

Turning then to the record before us, we find that LaBruyere's actions in loosening the bolts and prying the roller door loose from its wall anchors readily satisfy § 287.120.1's requirement of an *affirmative* act.

### 2. A *negligent* act.

Next, we find that with the word *negligent,* the legislature unequivocally expressed its intent that the culpable mental state or *scienter* of the conduct in question must satisfy the well-accepted meaning Missouri law has given to the concept of negligent conduct and necessarily excludes other culpable mental states such as reckless or intentional conduct.

Missouri courts do not recognize degrees of negligence at common law. *DeCormier v. Harley-Davidson Motor Co. Grp., Inc.,* 446 S.W.3d 668, 671 (Mo.banc 2014) (citing *Fowler v. Park Corp.,* 673 S.W.2d 749, 755 (Mo.banc 1984). Accordingly, because we may not read into a statute a departure from common law unless clearly intended and expressed, *see Cook,* 353 S.W.3d at 20 (holding common law may be abrogated only expressly or by necessary implication), we do not read into § 287.120.1 any requirement imposed by the legislature to prove that the act was done with some gradation of negligence such as "gross" or "slight" negligence, and we certainly may not disregard the legislature's use of the word *negligent* so as to allow reckless or intentional conduct to satisfy this section.

Rather, we interpret the statute's use of the term "negligent" in the phrase "affirmative negligent act" to require proof of an ordinary negligent act. Black's Law Dictionary defines the phrase "negligent act" as "[a]n act that creates an unreasonable risk of harm to another." *Id.* at 28.

19

This is consistent with the meaning generally given to the word "negligent" in Missouri tort law: "negligent" conduct is simply that which breaches a legal duty to conform to a certain standard of conduct to protect others against unreasonable risks of harm. *See Hoover's Dairy, Inc.* 700 S.W.2d at 431 (citing W. Prosser & W. Keeton, Prosser and Keeton On Torts § 30 (1984)) (defining the required elements of a negligence claim).

Negligent acts and intentional acts in the tort context are *contradictory* and *mutually exclusive. Hockensmith v. Brown*, 929 S.W.2d 840, 845 (Mo.App.W.D. 1996) (citing *Jones v. Marshall*, 750 S.W.2d 727, 728 (Mo.App.E.D. 1988)). A plaintiff *cannot recover* under a negligence theory if the only evidence is that of an intentional tort. *Id.* Notably, intentional torts, as distinguished from negligent or reckless torts, generally require that the actor intend the harmful *consequences* of an act, not simply the act itself. *Staub v. Proctor Hosp.*, 562 U.S. 411, 417 (2011) (citing *Kawaauhau v. Geiger*, 523 U.S. 57, 61–62, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998)).

And these are not newfangled pronouncements. Our Supreme Court has long recognized that the concepts of negligence and intentional conduct are fundamentally distinct. Nearly 70 years ago, for example, in *Lant v. Thompson*, 221 S.W.2d 834, 839 (Mo.banc 1949), the Court noted that "[w]ilful, malicious, or intentional misconduct is not, properly speaking within the meaning of the term negligence. Negligence and willfulness are mutually exclusive terms which imply radically different mental states." Revealingly, a current word search of the Revised Statutes of Missouri reveals that the words "negligence" or "negligent" have been used in over 200 sections of our laws, and never synonymously with *intentionally harmful* conduct.

The phrase "affirmative negligent act" has also been used elsewhere in Missouri tort law for many decades before it appeared in *Badami*, and it was never used to mean "intentional harm." For example, in numerous premises liability cases, such as *Gilliland v. Bondurant*, 59 S.W.2d 679,

20

687 (Mo.banc 1933), Missouri courts defined a landowner's duty to a licensee on his property as being to "not willfully or wantonly injure him, or knowingly let him go into a hidden peril, or otherwise, by an *affirmative negligent act*, injure him after his presence is or should be discovered in a position of danger." (emphasis added). And later, in products liability cases such as *Layman v. Uniroyal, Inc.*, 558 S.W.2d 220, 224 (Mo.App. 1977), the question of third-party indemnity was answered by asking whether the defendant committed an "affirmative negligent act," described also as "active negligence." Finally, in contributory negligence cases such as *Gilpin v. Pitman*, 577 S.W.2d 72, 79 (Mo.App. 1978), the plaintiff's own negligence was sorted out by determining whether the plaintiff committed an "affirmative negligent act."

Turning to the record here, we note that the Memses alleged that LaBruyere's conduct was negligent and neither party asserted or attempted to prove that LaBruyere's conduct was reckless or intentional. Also, the motion court found that the facts were undisputed that LaBruyere removed the bolts attaching the roller door to the wall and pried the door away from the wall knowing that Mems was in the vicinity below. We find therefore that at a minimum the record before us establishes as a matter of genuinely disputed fact that LaBruyere's actions in using tools to undo the bolts and to pry the roller door away from the wall with Charles Mems standing in the vicinity below constituted *negligent acts* as that phrase is used in § 287.120.1.

      3.    *Purposefully.*

Based on our conclusion that the word *negligent* in § 287.120.1 means that *only* negligent acts satisfy this provision, we also hold that it necessarily follows that the legislature cannot have intended *purposefully* to be synonymous with *intentionally*, as that word is used in Missouri tort law because the terms *negligent* and *intentional* represent mutually exclusive concepts. *Hockensmith*, 929 S.W.2d at 845.

21

We decline to succumb to the temptation to equate *purposefully* with *intentionally* in the tort sense of the word because to do so would render meaningless the word *negligent* in violation of one of our most important rules of statutory construction that we presume that every word in a statute has meaning and was included for a purpose. *Hewitt v. St. Louis Rams P'ship*, 409 S.W.3d 572, 574 (Mo.App.E.D. 2013).

Rather, we find that to give *purposefully* its fair, ordinary, and logical intendment, the focus must be solely on the physical act itself without regard to the culpable mental state of the defendant or whether the defendant intended the consequences since those issues have been determined by the legislature's employment of the word *negligent* in the amendment. Simply put, we find that *purposefully* here means that the defendant meant to do the physical act in question and that the physical act was not an accident or an inadvertence.

We find highly instructive the line drawn by the Supreme Court of the United States in *Staub* between an act done with the intention simply to do the act itself and an act done with the intention to cause the harmful consequences of the act. *Staub, supra,* 562 U.S. at 417 ("Notably, intentional torts, as distinguished from negligent or reckless torts, generally require that the actor intend the harmful *consequences* of an act, not simply the act itself."). This most closely captures the meaning we find the legislature intended to give *purposefully*—to simply intend to do the physical act itself – in this case, to loosen the bolts and pry the door.

In this way, these plain and ordinary meanings we find the legislature intended for *negligent* and *purposefully* allow those terms to smoothly and reasonably coexist within § 287.120.1. Negligent conduct is simply that which breaches a legal duty to conform to a certain standard of conduct to protect others against unreasonable risks of harm. *See Hoover's Dairy, Inc. v. Mid-America Dairymen, Inc./Special Products, Inc.,* 700 S.W.2d 426, 431 (Mo.banc 1985)

22

(citing W. Prosser & W. Keeton, Prosser and Keeton On Torts § 30 (1984)) (defining the required elements of a negligence claim). And such conduct may be done *purposefully* if the negligent act itself was meant to be done, was not inadvertent or the result of a mistake, but still produces risk resulting in harm even if it was not designed to cause such harm. 562 U.S. at 417.

Turning to the summary judgment record before us, we conclude that LaBruyere's conduct was done *purposefully* as that term is used in § 287.120.1. LaBruyere's affirmative acts—loosening the bolts and prying the roller door away from the wall—were done *purposefully* in that LaBruyere, without regard to the succeeding consequences, meant to do the physical acts of detaching the bolts and prying the roller door.

### 4. *Dangerously.*

Initially, we find that the motion court erred when it held that the Memses were required to prove that LaBruyere committed an *"inherently* dangerous" act. Since § 287.800 mandates that we strictly construe the provisions of the Act and the word *inherently* does not appear in § 287.120.1, the motion court erred by adding the word *inherently* and interpreting this section as it did. *See Templemire v. W & M Welding, Inc.*, 433 S.W.3d 371, 381 (Mo.banc 2014) ("The operation of the statute must be confined to matters affirmatively pointed out by its terms, and to cases which fall fairly within its letter.").

Nevertheless, we still must address the meaning of the word *dangerously* in the context of the phrase "affirmative negligent act that . . . *dangerously* caused or increased the risk of injury," and decide whether the Memses satisfied that requirement on this record. We observe that it is difficult to assign meaning to this critical word because of the significant overlap and redundancy among the concepts of negligence, danger, and risk, all of which are included in the provision before us.

23

One of Missouri's seminal cases defining negligence, *Hoover's Dairy, Inc., supra*, includes all three concepts in its description of duty: "A claimant in a negligence action must establish a (1) legal duty on the part of the defendant to conform to a certain standard of conduct to protect others against unreasonable risks," and "the existence of a duty . . . is generally measured by whether or not a reasonably prudent person would have anticipated danger and provided against it." 700 S.W.2d at 431 (emphasis added). Webster's Third defines *dangerously* as "in a manner or to a degree involving danger or risk." *Id.* at 573. Black's Law Dictionary defines only the adjectival form, "dangerous," and provides that it means "perilous; hazardous; unsafe" or "likely to cause serious bodily harm." *Id.* at 451.

We conclude that the legislature intended by use of the word *dangerously* to stress that to avoid co-employee immunity, there must be a showing that the employee's actions created or caused danger even if though there may be some redundancy with other terms in the section such as *negligent* and *risk* which also implicate the creation of danger.

And turning to the record here, we find there is evidence from which a jury could conclude that removing the bolts and prying the door away from the wall were acts that dangerously caused or increased the risk of injury to Mems. We believe this reading to be consistent with the intent of the legislature to allow co-employees to lose their immunity and be liable only when they have created or increased risk at the workplace. Admittedly, as in virtually any workplace and any workplace task, there was existing risk to Charles Mems in connection with assisting LaBruyere to bring down the roller door in this case. Perhaps the door was already loose and falls on its own with Mems below. But the record here would support a finding that LaBruyere created a new or increased risk to Mems when he loosened the bolts and pried the door away from the wall with Mems underneath it.

24

Therefore, we conclude that the motion court erred by finding that LaBruyere is immune under § 287.120.1 from liability for the Memses injuries and damages. But our holding that the motion court erred in its construction and application of § 287.120.1 does not end our inquiry because summary judgment, like any trial court judgment, is to be affirmed on appeal by any appropriate theory supported by the record. *Roberts*, 391 S.W.3d at 437.

III. *The record here establishes as matters of genuinely disputed fact that LaBruyere was not simply carrying out the employer's non-delegable duty to provide a safe workplace; but instead his conduct, because it created a transitory risk by making an otherwise reasonably safe workplace unsafe, was part of his own common law duty to Charles Mems and, as a result, summary judgment was not warranted.*

Since the exception to co-employee immunity in § 287.120.1 did not create a civil cause of action or abrogate the common law,[7] the Memses still have to demonstrate that they are able to

---

[7] The 2012 amendment to § 287.120.1 did not create a cause of action or abrogate the common law. The Missouri Legislature has many times demonstrated its clear understanding that an explicit pronouncement is required to establish a private right of action under statute, whether the legislature intends to codify the common law, build on top of it, or something else like provide for heightened damages for particular misconduct. *See, e.g.*, § 285.575.3 ("codify[ing] the existing common law exceptions to the at-will employment doctrine and . . . limit[ing] their future expansion by the courts" by providing "[a] protected person aggrieved by [an unlawful employment practice under the statute] . . . a private right of action"); § 407.025 (providing under the Missouri Merchandising Practices Act that "[a]ny person who purchases or leases merchandise primarily for personal, family or household purposes and thereby suffers and ascertainable loss of money or property, real or personal, as a result of the use or employment by another person of a method, act or practice declared unlawful by section 407.020, may bring a private civil action"); § 537.340 (providing that for certain trespasses to realty including cutting down trees and removing minerals, in a lawsuit filed under the statute, "the person so offending shall pay to the party injured treble the value of the things so injured, broken, destroyed or carried away, with costs," and that "[a]ny person filing a claim for damages pursuant to this section need not prove negligence or intent").

When a statute does not clearly and unambiguously create a cause of action, Missouri courts will *not* find that a common law claim has been abrogated:

Where the legislature intends to preempt a common law claim, it must do so clearly. Unless a statute clearly abrogates the common law either expressly or by necessary implication, the common law rule remains valid. A statutory right of action shall not be deemed to

25

plead and prove a cause of action beyond simply satisfying the exception in § 287.120.1. We reach this conclusion based again on the language of 287.120. Subsection 1 addresses employee liability twice: (1) an employee "shall not be liable for any injury or death for which compensation is recoverable" under the Act; and (2) every employee is "released from all other liability . . . except that an employee shall not be released from liability for injury or death if the employee engaged in an affirmative negligent act that purposefully and dangerously caused or increased the risk of injury."

Thus, since § 287.120.1 did not create a cause of action or abrogate the common law—it merely provided that employees were released from "all other liability" except when they engaged in an act satisfying the language of the exception, we must address the threshold question whether on this summary judgment record the Memses established as a matter of genuinely disputed fact that LaBruyere's conduct did not constitute merely the breach of the employer's non-delegable duty to provide a safe workplace, but rather that his conduct created a transitory risk and thus constituted a breach of his own common law duty of care to Charles Mems.

Our Supreme Court has pronounced that for purposes of determining whether a common-law claim of co-employee liability may survive a motion for summary judgment, "the *co-employee's* negligence is assumed," and "the only thing that matters . . . is whether the duty the

---

supersede and displace remedies otherwise available at common law in the absence of language to that effect unless the statutory remedy fully comprehends and envelops the remedies provided by common law. We strictly construe a statute when existing common law rights are affected, and if a close question exists, we weigh our decision in favor of retaining the common law.

*State ex rel. KCP & L Greater Missouri Operations Co. v. Cook*, 353 S.W.3d 14, 20–21 (Mo.App.W.D. 2011) (quoting *State ex rel. Brown v. III Invs., Inc.*, 80 S.W.3d 855, 859–60 (Mo.App.W.D. 2002)).

26

co-employee breached was part of the *employer's [non-delegable] duty* to protect employees from *reasonably foreseeable* [work] risks." *Conner*, 542 S.W.3d at 324 (emphasis added).

The scope of the employer's non-delegable duty is broad, but not unlimited. *Id.* at 322. Essentially, the employer's duty is limited to protecting against those risks that were *reasonably foreseeable to the employer. Id.* at 322, 324 (citing *Curtis v. McNair*, 73 S.W. 167, 168 (1903); *Smith v. S. Ill. & Mo. Bridge Co.*, 326 Mo. 109, 30 S.W.2d 1077, 1083 (1930)) ("It is the duty of the master to exercise reasonable care, commensurate with the nature of the business, to protect his servant from the hazards incident to it"—i.e., "to use all reasonable precautions which ordinary prudence would dictate, under the particular circumstances, in respect to the dangers to be reasonably anticipated and likely to occur to the servant in the course of the discharge of his duties.") (internal quotation marks omitted).[8]

Manifestly, employers are often forced to assign to employees work tasks that may pose risk to others, *Fogerty v. Armstrong*, 541 S.W.3d 544, 548 (Mo.banc 2018) (citing *Conner*, 542 S.W.3d at 321, 322–23), but the nature of the employer's *non-delegable* duty is that the employer simply *cannot delegate*—whether by assigning a work task to an employee or by other means— its duty to protect its employees against unreasonable risk of foreseeable harm. *Conner*, 542 S.W.3d at 322, 324 (observing that absent workers' compensation act immunity, "the employer could not evade liability for a breach of this non-delegable duty merely by assigning compliance with the duty to an employee"). Thus, *no matter who actually performed a work task that caused injury*, the measure of whether the harm stemmed from a breach of the employer's non-delegable

---

[8] In the course of applying this broad duty to particular factual scenarios, our Supreme Court has stated the employer's non-delegable duty included the duty to "provide a safe place to work," "provide safe appliances, tools, and equipment for work," and "give warnings of dangers of which an employee might reasonably be expected to remain in ignorance." *Conner*, 542 S.W.3d at 322.

27

duty remains whether it resulted from a risk that was *reasonably foreseeable from the employer's perspective*. *See Conner*, 542 S.W.3d at 324 (focusing on whether a breach of work safety "was *so unforeseeable to the employer* as to take it outside the employer's non-delegable duty") (emphasis added).

Missouri courts have labeled a risk that decreases work safety in a way that is not reasonably foreseeable to the employer a "transitory risk." *Id.* at 325. Our Supreme Court has quoted favorably the definition of "transitory risk" provided in *N. Pac. Ry. Co. v. Dixon*, 194 U.S. 338, (1904) (White, J., dissenting):

> The doctrine of transitory risk . . . really amounts only to this: that where the work is of such a character that *dangers which cannot be foreseen or guarded against by the master . . . suddenly and unexpectedly arise*, there is no neglect of a positive duty owing by the master in failing, by himself or the agencies he employs, to anticipate and protect against *that which the utmost care on his part could not have prevented.*

*Conner*, 542 S.W.3d at 325 n.7 (internal quotation marks omitted) (emphasis added). Our courts have also found that one example of a transitory risk is the *creation by a co-employee* of a hazard or danger, which our courts have repeatedly held does not fall within the employer's duty to provide a safe workplace. *Tauchert v. Boatmen's Nat'l Bank of St. Louis*, 849 S.W.2d 573, 574 (Mo.banc 1993); *Pavia v. Childs*, 951 S.W.2d 700, 701–02 (Mo.App.S.D. 1997). In these "creation-of-hazard" cases we understand our courts to be holding, consistent with long-standing principles of co-employee liability, that where the *co-employee's conduct* exposed the injured employee to a risk of harm that the *co-employee* should have recognized—but that the *employer* could *not* reasonably have anticipated—*the co-employee breached an independent duty to the plaintiff.* Simply put, in such cases the *co-employee, not* the employer, exposed the injured employee to an *unreasonable risk of foreseeable harm*.

28

The boundary between the employer's non-delegable duties and the breach of the employee's own duty to his co-worker is illustrated well in Judge Bland's opinion in *Schmelzer v. Central Furniture Co.*, 114 S.W. 1043 (Mo.App. 1908). There, Schmelzer's employer was refurbishing the third floor of its factory in St. Louis. *Id.* at 1044. The workers were tearing out the wooden flooring and shelving and tossing it out the third floor windows to the ground below, where it remained, as Judge Bland described it, in "a promiscuous pile." *Id.* Schmelzer's job was to take wood from the pile into the furnace room for use as fuel. *Id.*

Koetting, the third floor foreman, handed a seven foot board to a laborer named Kramer and told him to throw it out the window onto the pile. *Id.* Just as he pitched out the plank, Kramer looked out and "saw [Schmelzer] under the window in a stooping position, and hallooed to him to look out." *Id.* Nevertheless, the board struck and injured Schmelzer. *Id.*

Plaintiff claimed that Koetting as the employer's vice-principal was liable. *Id.* In reaching its decision, the Court stated as follows:

> Ordinarily the *master discharges his whole duty* to his servant when he uses ordinary care in the selection of his fellow-servants and provides suitable tools, appliances, etc.; when he has done this the servants must look to each other for protection in the performance of their several duties. [Citations omitted.] The work done by Kramer was not such as required the personal supervision of the master. Koetting was not required to follow Kramer to the window and tell him when to let the boards go; it was *Kramer's duty* to look out for plaintiff, his fellow-servant, and we think plaintiff's injury was caused by the negligence of Kramer, his own negligence concurring therein.

*Id.* at 1045.

Applying these principles, we find that LaBruyere was not merely carrying out one of the employer's non-delegable duties but that his conduct created a transitory risk to Mems which implicates his own common law duty of care to Charles Mems. Viewing the record in the light most favorable to Appellants, see *ITT Commercial*, 854 S.W.2d at 376, we acknowledge the

motion court's findings that there is evidence from which a jury could conclude that LaBruyere undid the bolts, pried the door away from the wall, and caused it to fall knowing Mems was in the vicinity below.

We also find that LaBruyere's conduct was *not* reasonably foreseeable to the *Employer*. Rather, it must have been unthinkable to the employer that he would do what he did. On this record, it was not the employer who put Charles Mems at an unreasonable risk of harm. LaBruyere created the hazard or danger—i.e., the "transitory risk."

Our conclusions here are supported by Supreme Court precedent. In *Conner*, 542 S.W.3d at 325, the Court identified two principal cases, *Marshall, supra,* and *Cain v. Humes–Deal Co.*, 49 S.W.2d 90 (Mo.banc 1932), where it determined that co-employee negligence was not reasonably foreseeable to the employer and thus did not constitute a breach of the employer's non-delegable duty.

In *Marshall*, the Court noted that the co-employee's conduct in trying to unkink the hose was sudden and unexpected by the employer and the Court found that the plaintiff fellow employee's injury came about not because the hose was defective, but as a result of the co-employee's negligent use of the hose. *Id.* And as the *Conner* Court observed, "[i]n *Marshall* . . . nothing under the circumstances—whether the tools, the place of work, or how the work was generally being done—suggested the employer could reasonably foresee" the co-employee's negligent conduct. 542 S.W.3d at 325 (citing *Marshall*, 296 S.W.2d at 3).

While a general risk that the roller door might at some point, for some reason, fall and cause injury would likely be considered foreseeable to Employer, there was nothing about the circumstances of the task assigned by Employer to LaBruyere and Mems—from the tools provided, to the place of work, to how the roller door was to be removed—that made it reasonably

30

foreseeable to Employer that LaBruyere would remove the bolts holding the door to the wall, pry the door away from the wall, and bring down the door with Mems below. This is similar to *Marshall*, where the employer reasonably could have foreseen that some employee action or some instrument of the job, such as the compressor hose, might cause injury. But, as the *Marshall* Court found, the employer could not have foreseen that type of co-employee conduct involved and the injury that resulted would occur. 296 S.W.2d at 2-3.

In *Cain*, a foreman sent the plaintiff and a co-employee to clean up nails, plaster, and other debris in a dark, unfinished building. 49 S.W.2d at 90. The plaintiff and the co-employee used shovels to sweep the debris into piles, shoveled the piles into wheelbarrows, and carted the debris off the premises. *Id.* The plaintiff asked the foreman to provide them with a light source, but the foreman told the plaintiff a light was unnecessary. *Id.* While working, the plaintiff stooped down to pick up a board. *Id.* As he did so, his co-employee forcefully brought the edge of a shovel down on the floor, causing a loose nail to fly into the plaintiff's eye. *Id.* at 90-91. The plaintiff later sued the employer for breaching its duty to provide him with a safe workplace. *Id.* at 91.

Our Supreme Court held in *Cain* that "the employer could not be liable for the co-employee's negligence because—even though the employer's non-delegable duty to provide a reasonably safe workplace included a duty to provide reasonable lighting—there was no reason to believe that the lack of lighting had anything to do with the co-employee's act in striking the floor with his shovel." *Conner*, 542 S.W.3d at 323 (citing *Cain*, 49 S.W.2d at 94). The Court reasoned that "there was no reason for McDaniel to strike his shovel forcibly against the floor . . . . His action in doing so was independent of the poor light in the room." *Conner*, 542 S.W.3d at 323 (quoting *Cain*, 49 S.W.2d at 94) (internal quotation marks omitted).

31

This case is also like *Cain*. Because there was no reason for LaBruyere to bring down the roller door while Mems was below, LaBruyere's negligent actions were unforeseeable to Employer and independent of any failure of Employer to provide a reasonably safe workplace.

In light of the foregoing, we find that Employer could not reasonably have foreseen LaBruyere's conduct and therefore there was no breach of Employer's non-delegable duty and Labruyere was not simply carrying out the Employer's non-delegable duty; that under our standard of review, the Memses have established that LaBruyere had a duty to Charles Mems under the common law; and that, finally, the motion court committed reversible error in applying the law, and the Memses' claims of co-employee liability against LaBruyere should have survived summary judgment.

### Conclusion

For the reasons stated above, we reverse the judgment of the motion court and remand for trial on the merits.

_____
James M. Dowd, Judge

Sherri B. Sullivan, P.J., and
Lawrence E. Mooney, J., concur.